13, 3832, 13, 3837, IMG Academies, LLP and others v. Westchester Fire Insurance Company and Great Divide Insurance Company. Four arguments not to exceed 15 minutes per side. Mr. Hacker for the appellant, Cross Appellee. Good morning, your honors, and may it please the court, John Hacker for the appellant, Westchester. I'd like to reserve five minutes for rebuttal, if I might, and my colleague, David Walulick, will be taking one minute from the opening argument to address issues pertinent to the Great Divide intervenor. All right. When IMG settled the Gestalt case for five million dollars, there's only one claim pending against IMG, and that was a claim under the Florida Deceptive and Unfair Trade Practices Act, sort of awkwardly referred to as FDUPA, asserting that IMG had misrepresented two condo buyers, that IMG was partners with K-Clubs and another developer in a new condo development. The Gestalt court had held, at the time of the settlement, that the only measure of damages that the plaintiffs could obtain from IMG was the difference between what IMG had promised them, which was a condo in which IMG was an active partner, and what IMG delivered them, which was a condo without IMG's participation. The Gestalt settlement is outside the scope of IMG's insurance policy with Westchester for two reasons. First, that policy only covers liabilities arising from accidents, and IMG's partnership misrepresentations, were not accidental under Ohio law, and two, the policy only covers liabilities for property damage including, quote, loss of use and difference in value damages. The only kind of damages available to the Gestalt plaintiffs are not loss of use damages under Ohio law. Those conclusions are compelled by both the plain terms of the policy and, more importantly, the legal character of the Gestalt FDUHPA claims, including the limited type of damages available to plaintiffs under FDUHPA. In other words, there was no coverage here, as a matter of law, the issue never should have gone to the jury. Let me begin with the point that there is no occurrence here because there is no accident. Ohio law is perfectly clear, and indeed it's not even disputed here, that a misrepresentation is not an accident for purposes of CGL coverage. The court's theory was not that the misrepresentation is an accident, but rather the jury below could have found that the Gestalt liability arose because K-Clubs abandoned the project, which IMG did not expect or intend. There are at least three independent problems, legal problems, with that conclusion. First of all, there is no FDUHPA liability for abandonment by somebody else. Even if that was true, even if that was the reason things happened in the real world, that K-Clubs abandoned the project, IMG could not be held liable for damages under FDUHPA for that abandonment. The policy only covers damages for, and there's no damages for somebody else's abandonment. The only damages sought, the only claims asserted against IMG when IMG settled the case was damages for the misrepresentation that IMG had made, which was actionable under FDUHPA. So the abandonment theory falls apart for that reason. That wasn't the basis for liability under FDUHPA. Even if it were, even if abandonment were the issue, that's still intentional conduct by IMG. Even assuming for a moment, although it's not proved, even assuming for a moment that IMG didn't intend or expect its partners to abandon the project, the Gestalt court and the court below both said that if it had been true, as it was not, if it had been true that then IMG would have been less likely to not pony up the money when its partners abandoned the project. So everywhere you turn, there's still intentional conduct. It was intentional conduct, in short, by IMG not to pay when the partners didn't pay. No matter what IMG expected with respect to its partners, IMG intentionally chose not to make up that difference. That's intentional conduct, and again, it's not disputed that intentional conduct like that, when it causes an injury, is not covered under Ohio law. Third, and finally, IMG made no effort below whatsoever to induce facts establishing that the abandonment was unexpected. It could have, had that been its actual theory at trial, come in to say that, well, we didn't expect our partners to abandon the project, and they made no effort to establish that. There's a complete failure of proof on that point, so we can't rely, we can't presume that the jury must have found that, because there's literally not a shred of evidence as to IMG's expectation with respect to what its partners might or might not do if economic conditions changed. And so there's no accident here as a matter of law. The fundamental point is there's no accident here as a matter of law, given what is required to be proved under FDUDPA. The second point is that there was no property damage. Your interpretation is that there's no circumstances under which there could be coverage for a breach of a contractual duty unless it's an accident. That would be taking matters a bit far in terms of your contract interpretation for this decision, would it not? I mean, if we were to say that all of the contractual breaches, they would all have to be accidental to be covered, I don't think the parties would agree that that's really what they thought they were entering into here. Well, with due respect, Your Honor, the policy, I don't think this is disputed, the policy only covers occurrences which are defined as accidents, and an accident in turn is defined as something unexpected or unintended, so I do think there's agreement between the parties that there is no coverage unless the act is accidental. That's common ground. The issue, the dispute between the parties is whether or not the claims asserted that there was damages for something that was an accident, and our position is, under FDUDPA, the only claim that was asserted against IMG was for the misrepresentation that they were in a partnership with the developers, and that that's not accidental by any definition. The other side's view, and the court below's view, is there was an accident here because what was unexpected was the failure of the other parties, but I've already, I have a problem with that. Well, the investors abandoned the project, and that was not the fault of IMG. Why wouldn't that be a covered occurrence? The problem is the policy only covers damages for something, so even if they did not expect the parties to abandon them, there wouldn't be liability under FDUDPA for that. They only get coverage for damages under FDUDPA, and there's no theory of liability under FDUDPA where they have to pay money to the plaintiffs because somebody else abandoned the project. The plaintiff's theory wasn't there was an abandonment, and therefore IMG's liable, or I'm liable, or anybody else in the world is liable. The theory was IMG has to pay me because IMG lied to me. That was the way in which they were going to get IMG to be held liable, and that was the only way under FDUDPA under which IMG could be held liable. The other problem here is that there's no damages for loss of use, as the court below has held to the contrary, but the problem is, again, you have to look at what was being claimed under FDUDPA. The Gustavity Court had already held at the time of settlement that the only damages that could be claimed were damages for the difference between what was promised, a condo project with IMG as a partner, and what was delivered. That's called a difference in value damages, and under Ohio law, you need look no further than the leading treatise on Ohio insurance law, which says, quote, under Ohio law, when there is a claim that the insured delivered a product different than that requested by a customer, the Gustavity plaintiff's claim, the customer has not sustained a loss of use of the requested product because he never possessed that product. Beyond that leading treatise, myriad cases consistently and uniformly hold, and they're quoted at page 18 of our reply brief, that loss of use damages does not include difference in value damages. And on the other side of the ledger, there are exactly zero cases, not one, that holds loss of use damages includes difference in value damages. Further, there were no loss of use damages sought by the Gustavity plaintiffs. There was no expert report, unlike in the Hartzell case that the other side relies on. The plaintiffs were not saying, here is the intended use, my use of the property, and here is the expected stream of income, and here is the money I want for it. They were limited to receiving only the difference in value, and those damages are not loss of use, and that is what the Gustavity court had already held, and that's all they were allowed to pursue. What about the duty to defend? Because when one of these cases, one of these claims come in, at that point it hasn't been adjudicated whether it's an intentional tort or an accidental occurrence. At that point, there is a duty to defend even before all that is adjudicated. A couple of points on that, Your Honor. First of all, what I'm talking about now is just indemnification liability. We're not addressing the duty to defend, which is indeed a threshold question evaluated when you're looking at the four corners of the complaint asserted and the four corners of the policy. It is our position, and I think we're correct about this, that when you look at the complaint, given that it was a FDUPA complaint, all you need to know is that they could only get difference in value damages, and they could only get recovery for misrepresentation. So even on that point, we think we should prevail on duty to defend. But this point is about indemnification where we do have more information. We have what the claim was, what the Gustavity court had said when the claim was settled, and the court had already said as a matter of law, you can only get difference in value damages. As a matter of law, the claim is based on a misrepresentation. So we have more information than the traditional threshold duty to defend. The second point of duty to defend I'll address on rebuttal, because that's the cross-appeal where there are other issues beyond that threshold inquiry as to reasons why Westchester did not have a duty to defend under these circumstances. Thank you. All right. You're out of time, unless you want to take some time from your rebuttal. No, thank you. Your Honor, I represent Great Divide. We are actually in an apathy as to both the appeal and the cross-appeal. We were the primary insurance carrier. Westchester was the excess insurance carrier. Prior to the underlying litigation being filed, we settled with IMG. We were brought into this lawsuit as a result of a motion for a third-party complaint filed by Westchester. We were granted, number one, the right to intervene by the court, and then we opposed it on substantive grounds. The substantive ground is that this court decided the One Beacon case in 2012, indicating that an excess carrier has no contribution right against a settled primary carrier. The flip side of that coin is that any unfairness in the elimination of the contribution right is remedied by the fact that there's a settlement credit that applies for whatever policy limits or whatever coverage the primary carrier would have owed. That's the GenCorp case that this court decided in 2005. So our simple position is that, number one, we should have never been brought into the suit, and number two, to the extent that IMG is claiming that there's still a contribution right out there, that's entirely not the case based upon these two twin Sixth Circuit precedents. The district court didn't get to that, did they? They did. They reached it in their May decision. The court expressed... So the district court has said that under no circumstances can Westchester seek contribution from you on the duty to defend if there is a duty to defend. That's correct. In fact, we cited it at length. Why would the district court have said that when he found there was no duty to defend? Because the issue was before the court based upon the briefing. To the extent that IMG was arguing that there was still a theoretical contribution right in the future, the district court addressed that and closed the door on that issue by saying that by settling, IMG took the risk that it would have no more defense obligation from our policy. To the extent that Westchester is arguing that the defense... Wait a minute. IMG may have no further claim. The claim is whether or not Westchester can come back against you, and how does that get resolved by the IMG settlement? Whether Westchester can come back against Great Divide is resolved by the One Beacon case, which expressly held no contradiction. Has the district court addressed that? Yes. It cites the One Beacon case, I believe, and also said that any unfairness is remedied by the fact that there's a credit through the destruction of the subrogation right. I believe we cite that on pages six and seven of our January 14th brief, if I'm correct. Thank you. Good morning, Judge Keith, Judge Clay, Judge McKeague. My name is Brent Brocker, arguing on behalf of IMG Worldwide Inc. and IMG Academies. Thank you for hearing this important case for IMG. The linchpin of Westchester's entire argument is that the Gastaldi case is a misrepresentation case and that IMG could only be liable for its intentional misrepresentations. That is a completely incorrect reading of Gastaldi and how Judge Altonga described it in her summary judgment order out of the Southern District of Florida, how the jury responded to interrogatories and argument in the trial below, and how Judge Nugent explained Gastaldi in his May 2013 order, which is under appeal. First of all, there's no evidence whatsoever that IMG made any representation with any intent to deceive. When you look at Judge Altonga's order, and I think that other than the policies and perhaps the complaints, that's probably the most important document in the case. What she says is that IMG may have given a misleading impression to the plaintiffs that IMG was actually a participant or a builder with respect to this project, on the one hand, and secondly, that IMG allowed in marketing materials to say that it was a partner of K-Clubs, which was the actual developer. But the only way that liability attaches under FDUPA in this case is if the parties leave the project and it never gets built. And so the fact that IMG, when the developers unexpectedly and unintendedly, from IMG's perspective, abandoned the project, the fact that the development never got built and IMG didn't step forward to do it, is a critical core component of the FDUPA claim here. And if you think about it, that makes sense because the plaintiffs dismissed their misrepresentation claims. They did that, as Judge Altonga explained, because of the 270 plaintiffs here, only three of them ever even came in contact with IMG. There was no intent to deceive. There was no reliance that the plaintiffs could show on any particular statement that IMG made in order to sustain a fraud claim. This was a FDUPA cause of action in which it was absolutely critical that the unexpected abandonment of the project by the developers and then IMG not stepping forward is part of the unfair and deceptive acts, which is a core element of FDUPA. So for them to say that IMG would only be liable for its intentional misrepresentations is unduly restrictive reading of that case. And again, I invite the court to review Judge Altonga's order and Judge Nugent's ruling as well as the jury responses. One of the things counsel said in argument was that IMG could only be liable for K-Club's abandonment. That's not true. The claims against IMG alleged that IMG itself didn't step in, despite these alleged representations that were made out in the market. And that would be the source of IMG's liability, not some vicarious liability for K-Club's acts. In fact, if you look at the ruling by Judge Altonga, she said specifically that IMG could not be held vicariously liable for K-Club's acts and that direct liability needed to attach to IMG in order for a claim to be made. I thought Mr. Hacker was arguing on that point that your decision not to step in and fund couldn't possibly be an accident. That's an intentional decision. It's the abandonment that you have been squabbling about, about whether that was or wasn't a theory and the reason for that is obvious, because the abandonment was an accident in terms of it being unexpected, at least vis-a-vis IMG, right? He argued that as well. Yes. I thought that was his second point, that to the extent IMG... I'm just trying to figure out how you're emphasizing you could have also been held liable for failing to step up and contribute. Let's assume that that's true under the Florida law. How does that become an occurrence? No, Your Honor, what I'm arguing is that IMG's failure to go ahead and develop the project in light of what happened was a core element of the plaintiff's FDUPA claims. The representations out in the market were also a part of it, but in order to recover under FDUPA, you have to have unfair or deceptive practices. And the practices here included the representations as well as when the developers then bailed out IMG's unwillingness or inability or whatever it was to then carry the project forward. It's the entire stream of events and actions that constitute and give rise to potential liability under those claims. I get that. Okay. I was with you right up until this argument, which seemed to me to be sort of giving something away to the other side. Oh, I... If you make a conscious decision not to finish the project or to contribute money, how can that be an occurrence if occurrence is defined as an accident? Okay. If I gave the impression that IMG's inability or unwillingness to go forward with the project was the occurrence, then I did not intend to do that. The occurrence here, the unexpected event and happening from IMG's perspective was the developers unexpectedly, from IMG's perspective, bailed out of the project. And Mr. Hacker says that there's no evidence, that IMG didn't submit a shred of evidence in that regard in the trial. That's absurd. The first letter back from IMG to Westchester after it denied coverage was a letter from IMG's general counsel admitted into evidence for all purposes at the trial in which Mr. Hacker says, from IMG's perspective, which is the correct viewpoint when conducting an occurrence analysis, the unforeseen and unplanned circumstances was the market forces that apparently rendered the project not feasible and K-Clubs and SunVest's inability or unwillingness to proceed with the project. So... And that's evidence. And that was also true in Judge Altonga's order in which in the very first paragraph of her order, she describes the basis for these FDUPA claims. And that recitation includes a statement that the plaintiffs alleged that the defendants, including IMG, contrary to the representations, didn't follow through with the restoration of the project, leaving the plaintiffs with these unrefurbished residential units. And so there clearly is evidence with respect to that point, as Judge Nugent found in his order. So the nature of the FDUPA claims... But where I'm still confused is there's lots of stuff that you may or may not be liable for under the Florida law, but we have to look to see whether those claims, whatever they are, also are covered under this particular insurance policy, which requires an occurrence which is an accident. So we've talked about the first issue, and that is whether you step forward and contributed money. You're claiming that the bailout of the partners was the event that satisfies the definition of occurrence and accident, right? Correct. Now, what nobody has said is my understanding is the Florida judge said that that can be covered... Well, actually, I misspoke. The Florida judge isn't talking about coverage. The Florida judge said that you can be liable for their abandonment if you participated in a violation of the act, even if that violation was initiated by another. So that's how you get drawn in to their abandonment. And that, then, is what you bootstrapped your argument to say was an occurrence and an accident, right? That's correct, Your Honor. And that is exactly what Judge Dugent stated in his ruling below. I won't read from it, but he essentially says that IMG's failure to provide financial backing when K-Clubs abandoned and the consequential abandonment of the remaining developers was the theoretical basis for IMG's financial liability under FDUPA. And so, yes, that was the unexpected or unintended occurrence that happened here in which the jury was presented with all these arguments and determined, yes, that was the triggering event for liability rather than whatever representations IMG was making out in the market. Now, the consequence of that, of course, is that the occurrence cases that Westchester relies on are these very narrow misrepresentation cases. This is not a misrepresentation case. It's a FDUPA case in which conduct beyond a misrepresentation could give rise to liability as the jury and Judge Nugent determined. And under those circumstances, the cases that we cite, which are the general law of occurrence in Ohio, which is a flexible standard that could easily accommodate this as the jury determined, would apply here. And I think the other point worth mentioning is that they're not appealing from Judge Nugent's denial of the summary judgment motion because the case then went to trial and a jury verdict was rendered. I think it's black letter law that in that circumstance, you could only appeal from the jury verdict. And they never objected to any of the jury instructions or raised in their appeal any issue with any of the instructions that Judge Nugent provided because they were all essentially requested by Westchester. So that's another thing I think the court needs to consider. Let me move on because I've got some other ground to cover. Just very briefly, they say in their brief that IMG doesn't contend that the policy is unclear. That's absolutely incorrect. We tried the case because the policy was unclear. Judge Nugent ruled in response to summary judgment motions that there was at the very least a latent ambiguity with respect to this language as applied to the very complicated Gastaldi case and sent the case to the jury to determine whether that was coverage. That was a correct ruling under Ohio law under the cases we've cited, including under the comments to an Ohio forum jury instruction, which says specifically that the common view now is that if there is an ambiguity with respect to policy language, it's a question for the jury. And that's why Judge Nugent sent it there. The other point I want to raise in the indemnity context is this issue that they say very forcefully that IMG was required to come in and prove its liability to the jury in connection with Gastaldi in order to recover. That is not the law of Ohio. There is no case that says that in this context. We have cited cases that say that in the settlement context, you don't need to look specifically at the complaint. You can look at other aspects of the record. But the cases they cite for their proposition that Ohio is in some minority of jurisdictions that requires liability to be established by proof, they don't apply to the situation. They cite Grange, Globe, and Blair. None of those cases involve an indemnity situation. Grange was insurance, but in that case, the insured won in the court below with respect to liability. So that was a duty to defend case. And the others were common law cases that did not involve insurance. The case we cite, Parker-Hannafin, involved property damage claims, a duty to defend, very close to this situation. In that case, the Southern District of Ohio, I believe it was, said that so long as the that could support indemnity in the settlement context. And of course, if Ohio law had been as they urge, Parker-Hannafin would have cited that law. It had to look to Michigan law in order to put forward that standard. And of course, Judge Nugent essentially followed it. We also cite treaties that we think clearly undercut what they're saying with respect to Ohio law. And then finally, on that point, even if they were right, the summary judgment order that we put into evidence for any purpose, quotes from deposition testimony, quotes from separate statements of undisputed fact, and that, again, came into evidence for any purpose. I can think of no better proof of what the parties were alleging in the context of a settlement in which liability was disputed. IMG disputed vehemently its liability in the Gestalt case. I'm not sure what else we were supposed to introduce at trial, but the district court's judge's order that analyzed the evidence that had been in discovery that had been taken to that point and concluded whether there were disputed issues of fact and so forth. So that is another overstatement, we think, by Westchester. I think the occurrence and the property damage cases and issues are well-briefed. Hartzell, I think, just absolutely eviscerates their argument with respect to these loss of use damages. When you suffer a loss of use, the judge in Hartzell said he couldn't think of any other way to measure such loss other than an economic damage analysis. And the FDUPA claim or statute in Case Lock and Strewing, it says specifically that damages are awarded based on the value of goods or services delivered versus how they may have been represented. That's a damage model. But the plaintiffs in Gestalt were seeking damages under FDUPA. And damages are covered under this policy so long as they are property damage caused by an occurrence. So I'm comfortable, again, that the briefs cover that point. Now, let me just quickly turn to the duty to defend. We feel very strongly about that. Arguably, the grounds for overruling or reversing Judge Nugent on that point are even stronger than affirming a jury verdict that we have because the standard is so broad for the duty to defend. The fees incurred here are undisputed, so this court could direct Judge Nugent to enter judgment in IMG's favor in that undisputed amount. The absence of proof arguments that they make with respect to Ohio law don't apply to the duty to defend. And then the core issue with respect to the duty to defend analysis seems to be whether IMG's rights to pursue Westchester were somehow extinguished with its settlement from Great Britain. The practical point I'll make here, and I think the briefs cover this very well, we had an opportunity to reply, but the practical point here is there is no case in the country that holds that when an insured settles with one insurer with respect to the duty to defend, it extinguishes another insurer's duty in that regard. No case in the country. Otherwise, they would have settled it or cited it. There are cases that apply to that in the indemnity context, but that's a different set of considerations where you've got different limits that apply and so forth. The duty to defend is far different. You're not taking any position in the fight between Westchester and Great Divide other than to say that you didn't do anything in your settlement that would get Westchester off the hook. That's correct. That's correct. Beyond that, you get your money from Westchester. You don't care what they do. You don't have a dog in that fight. And that was going to be my last point. The only reason Great Divide is here is that Westchester filed after the jury verdict. This was incredible. After the jury verdict is rendered and we get a partial judgment against Westchester, it files a motion to implead Great Divide for contribution in this case. And we, of course, oppose it and say that you can't do that under Rule 14. We're entitled to our judgment. That's a different fight. And then, of course, Great Divide intervenes to oppose that and so forth. But the point here is you're exactly right, Judge McKeague, and not only that, but Westchester knows that it has equitable contribution claims that will survive all this against Great Divide. I mean, that's clear under the case law. Aetna, Pennsylvania General. I mean, they say specifically that. I want to wind up. This will do it. They say specifically that claims for contribution between breaching insurers sound in equity, not in the contractual relationships between the parties. And so those claims are preserved, and they'll have that fight a later day, but that's not IMG's issue. Thank you. Thank you for your patience. Thank you, Your Honor. Just a few notes on rebuttal. First of all, with respect to the question of an accident and FDUKTA, the key question here that my colleague elides completely is that we have to establish, they have the burden to establish the basis for their liability under FDUKTA, not just that there was something out there that was accidental, something out there they didn't anticipate. The issue is why did they have to pay money to the plaintiffs? What was the theory of paying money to the plaintiffs? Was it because there was an accident that they paid money, like in a traditional negligence kind of case? Or was it because of something else that was non-accidental? And the only basis under FDUKTA for making them pay money to the plaintiffs was the misrepresentation about partnership that they made. They can't come in and say, we didn't do it. We're innocent under FDUKTA, and therefore, everything that happened was unanticipated because we're innocent parties, because that means there's no basis under FDUKTA for liability. There's no damages liability that's covered at all. The question has to be, what was accidental? Was the accident they point to the basis for liability? And the best case we have for that is the Qualcomm case, which says, even if there's property damage sort of in the air, that doesn't change the nature of the claim. That's what you have to look at is the nature of the claim. There's no abandonment theory under FDUKTA. There's only a misrepresentation theory. It is true, as Judge McKee pointed out, the Gestalti judge pointed to the possibility of liability based on the other's conduct, but it wasn't just abandonment in the air. It wasn't just the unanticipated abandonment that gives you liability under FDUKTA.  It was the misrepresentation of partnership that was the basis for getting to the acts of the others. On page 40 they say, if the defendants had been partners in the project, there was a greater likelihood they would have put money up to conclude the project because each partner would have been liable for the partnership's obligation. The decision to abandon the project would have been harder and perhaps costlier. And again, counsel has no answer at all, none, to the point that the decision to abandon by IMG was itself an intentional decision and therefore not accidental. On loss of use, I think the Hartzell case proves our point, your honors. It's so important to look at that case and compare it to this case. In Hartzell, the underlying plaintiff was claiming damages for the loss of use of their manufacturing facility. When the fans exploded and broke and they couldn't cool the facility, they lost use of the facility. And they had claimed a specific number of damages for that. Said here's the loss worker productivity, here's the amount of money we want from you, a product manufacturer, because of the loss of use of our facility. That wasn't claimed in this case. And the court said, not incorrectly, that that can be loss of use even though it's economic. We're not contesting that point. Our point and the law's point, perfectly consistent in the case law, is that you have to show a claim damages for loss of use which are not difference in value damages. If this court says in this opinion that the plaintiffs in this case were pursuing loss of use damages, even though the Gestalt court had said they were limited to difference in value damages. If this court says those difference in value damages, the only damages they were pursuing, the only damages they could pursue, constitute loss of use damages. It will be the first court in this country to have so equated that kind of damage. To say that loss of use and difference in value are the same kind of damage. The case law is perfectly uniform to the contrary. The only point I would make. Now you got me confused. Are you saying that there is no basis here for there to have been a loss of use? Or are you saying that even assuming there was loss of use of these condominiums, you can't measure that, the damages for that loss of use by the difference in value? I think more the latter. The Gestalt court. You're complaining about the damage calculation, not the theoretical question as to whether there's coverage for loss of use. There is coverage for loss of use. What I'm saying is that the Gestalt plaintiffs, under FDIPPA, could only claim the difference between what they sought and what they got. And that no court has ever said that difference in value between the product constitutes loss of use. That's my point. So it is a theoretical point. Under FDIPPA, you can only get difference in value. That's premise one. Premise two is that difference in value damages, as a matter of law, are not loss of use damages. It's a different type of damage. If they had been able to, under FDIPPA, to come in and say, I anticipated these condos. I was going to have a rental stream. Here's the stream of income I was going to get. That would be like Hartzell. That would be loss of use. But they're not allowed to do that under FDIPPA. The Gestalt court had already said that. They tried to get more damages. The Gestalt court said, you can't have those. Under FDIPPA, you only get the difference in what you wanted and what you got. And then they settled the case. So we know, as a matter of fact, what they were pursuing. We know, as a matter of law, what they were allowed to pursue. And we know, as a matter of law, that those aren't loss of use damages. Just briefly on the duty to defend. The key point here is that, unlike every case they rely on, we are, Westchester was a true excess insurer. All the, the only duty that we had, it wasn't even a duty, the policy specifically disclaimed, any duty to defend, if the primary failed, excuse me, any duty, a defense duty, unless and until the primary insurance was exhausted. We were acting basically like a surety to say, if the primary didn't defend, we would undertake to defend, that's a language of surety. And under surety law, if the primary debtor fails, the surety, the, the creditor can go against the surety and get the money. But if the creditor goes to the debtor and says, I'd like to compromise the claim, the $100,000 you owe me, let's make it $50,000. Once they, they compromise that claim, and the creditor releases the debtor, the creditor then, then can't turn to the surety and get the extra $50,000. That's the difference. That's the way in which our policy operated. Well, wouldn't that depend on whether he gave notice to the surety that he was getting ready to settle? I don't think it matters either way if the creditor goes to the debtor, the primary debtor, and says, I'm willing to compromise my claim with you. Once you do that, and release that primary debtor from the primary debtor's obligation, the surety's off the hook too, because the surety's just backing up the primary debtor. It's not an independent defense duty like you see in the cases that are referred to as coincidental excess insurance. And in that situation, you do have, that's a policy where it's fundamentally a primary policy, and the economics reflect a primary policy. Here, it's a true excess where it is assumed the primary is going to have the duty all the way through. And Great Divide had the duty all the way through here, and- You might want to wind up there. I understand. And on that basis, that's sort of the fundamental difference between the cases they rely on in our situation. In our situation, it doesn't reflect the economics of the bargain. It doesn't reflect the language of the policy, or the basic understanding of what excess insurance is. Thank you, your honors. Thank you. We have one more rebuttal argument of one minute. Thank you for your time reserved, but if you could just grant me 15 seconds on the last comment by IMG. You had originally reserved for a minute, I think. You can go ahead and do that if you want to. The last comment by IMG in their argument was that the contribution rights are preserved for a later day. That's directly contrary to this court's decision in One Beacon, which held that contribution rights are extinguished when a primary carrier settles. I just want to make sure that that's clear for the court. All right, thank you. Thank you very much, and the case is submitted.